UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DOUGLAS HIGGINBOTHAM,

                              Plaintiff,                          14-cv-8549 (PKC)(RLE)

         -against-                                               MEMORANDUM
                                                                 AND ORDER

CITY OF NEW YORK, POLICE OFFICER
CURTIS SYLVESTER, SHIELD 5060, POLICE
SERGEANT CHRISTOPHE TOMLINSON,
SHIELD 3686, POLICE CAPTAIN JOHN DOE,

                              Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

         Plaintiff Douglas Higginbotham brings this action against defendants the City of

New York (the "City"), Police Office Curtis Sylvester, Police Sergeant Christophe Tomlinson,

and an unnamed police captain, asserting six claims under 42 U.S.C. § 1983.  He alleges that,

while working as a journalist covering an Occupy Wall Street protest, he was arrested without

probable cause and prevented from exercising his First Amendment rights.  The defendants now

move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P.  For the following

reasons, the motion is denied with respect to Higginbotham's false arrest and First Amendment

claims, but granted with respect to all the other claims.


BACKGROUND

         The following facts are taken from the complaint, and are accepted as true for the

purposes of this motion.  On the morning of November 15, 2011, Higginbotham was working as

a freelance video-journalist for TV New Zealand, covering an Occupy Wall Street protest in

lower Manhattan.  (Compl. ¶ 9.)  To get a better vantage point, he climbed onto the top of a telephone booth.  (Compl. ¶ 10.)  While he was filming "an arrest that resulted in a significant injury to the person being arrested," he was ordered to climb down from the telephone booth by the defendant police captain, but could not immediately comply because there were too many people surrounding the booth.  (Compl. ¶¶ 11–12.)  Eventually, he began to climb down, and when he did so, the three individual defendants pulled his legs out from under him, causing him to drop his camera and fall onto the ground.  (Compl. ¶ 13.)  He was placed in plastic handcuffs and transported to a police processing center, where officers had to use a bread knife to cut off the handcuffs.  (Compl. ¶ 14–15.)  In total, he spent approximately three hours in handcuffs, which caused bruising and pain to his wrists.  (Compl. ¶ 15.)  After approximately four hours in custody, Sylvester issued Higginbotham a summons to appear in court, and released him. (Compl. ¶ 16.)  Higginbotham was charged with one count of disorderly conduct, but the charge was dismissed on February 17, 2012.  (Compl. ¶ 17–18.)

        In addition to physical injuries, Higginbotham alleges that his video camera was damaged during the arrest.  (Compl. ¶ 19.)  He also alleges that, because his arrest resulted in international press coverage, various news outlets stopped working with him, resulting in a significant loss of income.  (Compl. ¶ 20.)

        Higginbotham filed this action on October 27, 2014.  (Dkt. No. 1.)  The defendants moved to dismiss on February 23, 2015.  (Dkt. No. 10.)  The Court heard oral argument on the motion on April 24, 2015.


LEGAL STANDARD

        "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "The

plausibility standard . . . asks for more than a sheer possibility that a defendant has acted

unlawfully." Id.  In assessing the complaint, the district court must draw all reasonable

inferences in favor of the non-movant.  In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir.

2007).  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action,"

however, are not entitled to any presumption of truth.  Iqbal, 556 U.S. at 678.


DISCUSSION

I.      False Arrest Claim

           Higginbotham's first claim under section 1983 is for false arrest.  "A section 1983

claim for false arrest is substantially the same as a claim for false arrest under New York law."

Jenkins v. City of N.Y., 478 F.3d 76, 84 (2d Cir. 2007).  To establish such a claim, "a plaintiff

must show that '(1) the defendant intended to confine him or her, (2) the plaintiff was conscious

of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement

was not otherwise privileged.'" Holland v. City of Poughkeepsie, 90 A.D.3d 841, 844 (2d Dep't

2011) (quoting Lee v. City of N.Y., 272 A.D.2d 586, 586 (2d Dep't 2000)).

           The defendants argue that the fourth element is not satisfied, because there was

probable cause to arrest Higginbotham.  "'Probable cause is an absolute defense to a false arrest

claim.'" Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013) (quoting Torraco v. Port Auth.

of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010)).  "'An officer has probable cause to arrest

when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime.'"  Id. (quoting Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006)) (ellipsis omitted).  Even if probable cause for the actual arrest charge did not exist, the existence of probable cause to arrest for any offense precludes a false arrest claim.  Jaegly, 439 F.3d at 154.

   First, the defendants contend that there was probable cause to arrest Higginbotham for a violation of N.Y. Penal Law § 240.20(6), the provision under which he was in fact charged.  That subdivision of New York's disorderly conduct statute prohibits "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse," "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof."

   The parties dispute whether, as a journalist covering the protest, Higginbotham can properly be said to have been "congregating" with the protesters within the meaning of the statute.  The Court need not resolve this question, however, because there is a different reason why the statute does not cover Higginbotham's conduct: the defendants' order for Higginbotham to climb down from the telephone booth was not an order to "disperse."  That word, as used in the statute, means "[t]o separate, go different ways."  Oxford English Dictionary (2d ed. online version Mar. 2015).  There is no allegation that Higginbotham was ordered to "separate" himself from the rest of the crowd, by leaving the scene of the protest.  On the contrary, as alleged, the defendants instructed that he climb down from the phone booth into the crowd.  Further, "[a] group can disperse; an individual cannot."  Goodwine v. Nat'l R.R. Passenger Corp., No. 12-cv-3882(TLM), 2014 WL 795756, at *7 (E.D.N.Y. Feb. 27, 2014).  Because the defendants' order

was directed at Higginbotham alone, it could not be an order to disperse.  See id. (holding that there was no violation of section 240.20(6) where the officer instructed the plaintiff alone to leave the area, rather than instructing the congregation of which the plaintiff was allegedly a member to disperse).  United States v. Nelson, 500 F. App'x 90 (2d Cir. 2012), on which the defendants rely, is not to the contrary.  In that non-precedential decision, the Second Circuit affirmed the undersigned's finding that there was probable cause to arrest the defendant under section 240.20(6), even though the defendant was standing alone at the time of his arrest.  Unlike here, however, it was undisputed in Nelson that the defendant "was standing with two other persons at the time the officer ordered the group to disperse."  Id. at 92.

The defendants' attempt to rely on section 240.20(6) fails for the additional reason that Higginbotham is alleged to have complied with the defendants' order as soon as he had the opportunity to do so.  The complaint states that he "was unable to immediately comply with [the] order because there were many people surrounding the booth" (Compl. ¶ 12), but that he then "began to climb down."  (Compl. ¶ 13.)  There is nothing in the complaint to suggest that Higginbotham ever "refused" to comply with the order, as required by the statute.  See Dinler v. City of N.Y., No. 04 Civ. 7921(RJS)(JCF), 2012 WL 4513352, at *11 (S.D.N.Y. Sept. 30, 2012) (holding that there was no probable cause under section 240.20(6) to arrest protesters who had no opportunity to comply with a dispersal order because their route was blocked).  And there is no allegation suggesting that a reasonable police officer in the defendants' situation would have believed that Higginbotham was refusing to comply.

Next, the defendants invoke section 240.20(7), another subdivision of the disorderly conduct statute.  That subdivision, which carries the same mens rea requirement as subdivision 6, prohibits "creat[ing] a hazardous or physically offensive condition by any act

which serves no legitimate purpose."  The defendants argue that Higginbotham could have fallen off the phone booth or dropped his camera, putting the crowd below him at risk of injury, and further contend that, while it was legitimate for Higginbotham to film the protest, climbing onto the phone booth simply to obtain a better vantage point does not amount to a "legitimate purpose."

The complaint adequately pleads that the defendants did not have probable cause to believe that Higginbotham created a "hazardous . . . condition" within the meaning of the statute.  Assuredly, a large adult standing high above a tightly-packed crowd on a small platform while holding a heavy piece of equipment creates such a hazard, and recklessness can be inferred from his decision to climb onto such a platform.  But the Court is not prepared to hold that sufficient facts are alleged in the complaint to establish probable cause as a matter of law.  The complaint says nothing about Higginbotham's size, about the size and weight of his camera and whether it was secured to his person, about the height of the phone booth and its suitability as a platform for a male adult, or about how tightly packed the crowd around the phone booth was at the time Higginbotham climbed onto it.  Because, at the pleading stage, Higginbotham is entitled to all reasonable inferences from the facts alleged in the complaint, the Court must assume that those variables were such that Higginbotham was not creating a hazardous condition.  The record may of course look very different at the summary judgment stage, but for now, Higginbotham has plausibly alleged a lack of probable cause to arrest him for a violation of section 240.20(7).

The same reasoning applies a fortiori to N.Y. Penal Law § 120.20, which provides: "A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." "Serious physical injury" is defined to mean "physical injury which creates a substantial risk of

death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." N.Y. Penal Law § 10.00(10). Because the complaint adequately alleges no probable cause to believe that Higginbotham was creating a hazardous condition, it also adequately alleges no probable cause to believe that he was creating a substantial risk of serious physical injury.

Finally, the defendants assert that there was probable cause to arrest Higginbotham for reckless endangerment of property under N.Y. Penal Law § 145.25,[1] which prohibits "recklessly engag[ing] in conduct which creates a substantial risk of damage to the property of another person in an amount exceeding two hundred fifty dollars." The assertion is premised on the risk of damage to the phone booth itself, which, the defendants contend, may not have been "built to hold an adult." (Defs.' Br. 9.) Without knowing any of the characteristics of the phone booth, and whether those characteristics would have been apparent to Higginbotham or the defendants, the Court cannot conclude as a matter of law that there was probable cause to arrest Higginbotham for a violation of this statute.

The defendants further argue that, even if there was no probable cause to arrest Higginbotham, there was nevertheless "arguable probable cause" to arrest him, and they are thus entitled to qualified immunity. See Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015). "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" Id. (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004)).

On a motion to dismiss, however, a qualified immunity defense based on arguable probable cause "'faces a formidable hurdle . . .' and is usually not successful." Field Day, LLC

---

[1] Both the defendants and Higginbotham incorrectly cite N.Y. Penal Law § 140.25, which is New York's second-degree burglary statute.

v. Cnty. of Suffolk, 463 F.3d 167, 191–92 (2d Cir. 2006) (quoting McKenna v. Wright, 386 F.3d 432, 434 (2d Cir. 2004)).  This case is no exception.  In support of qualified immunity, the defendants merely summarize their version of the facts and assert that "the officers were objectively reasonable and patently not incompetent."  (Defs.' Br. 12.)  At the summary judgment stage, they will have the opportunity to try to demonstrate this by submitting evidence showing that reasonably competent officers in their situation could have at least disagreed on whether probable cause existed.  Based solely on the complaint, however, the Court cannot conclude that this must have been the case.

Because the complaint plausibly alleges that there was no probable cause to arrest Higginbotham for a violation of any of the four statutes suggested by the defendants, and because the defendants are not at this stage entitled to qualified immunity, Higginbotham has adequately stated a section 1983 false arrest claim.

II.   Malicious Prosecution Claim

Higginbotham next asserts a section 1983 claim for malicious prosecution.  To prevail, he "must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law."  Manganiello v. City of N.Y., 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted).  In New York, the elements of malicious prosecution are the commencement of a criminal proceeding, its termination in favor of the accused, lack of probable cause, and actual malice.  Martinez v. City of Schenectady, 97 N.Y.2d 78, 84 (2001).  Under section 1983, the plaintiff must also show "that there was . . . a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000).

The complaint adequately pleads the elements of a state-law malicious prosecution claim.  As discussed, Higginbotham has plausibly alleged a lack of probable cause for his prosecution under section 240.20(6).  Further, "'a lack of probable cause generally creates an inference of malice,'" Manganiello, 612 F.3d at 163 (alteration omitted) (quoting Boyd v. City of N.Y., 336 F.3d 72, 78 (2d Cir. 2003)), and nothing in the complaint rebuts that inference as a matter of law.  But Higginbotham has not properly alleged a post-arraignment liberty restraint.  He alleges that, following his arrest, he was issued a summons (Compl. ¶ 16), but does not allege that he was ever arraigned before the charge against him was dismissed three months later.  "[T]he issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." Burg v. Gosselin, 591 F.3d 95, 98 (2d Cir. 2010).  Stampf v. Long Island Railroad Co., 761 F.3d 192 (2d Cir. 2014), on which Higginbotham relies, is inapposite, because that decision concerned only a state-law malicious prosecution claim, id. at 196, and thus did not discuss the requirement of a constitutional violation.  Accordingly, Higginbotham's section 1983 malicious prosecution claim must be dismissed.

III.    Excessive Force and Assault Claims

Higginbotham next brings claims for excessive force and for assault.  A section 1983 excessive force claim arising in the context of an arrest is analyzed under Fourth Amendment principles.  Graham v. Connor, 490 U.S. 386, 394 (1989).  To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.  Higginbotham's excessive force claim could be premised on the allegation that the

- 9 -

defendants pulled his legs out from under him as he was climbing down from the phone booth, or on the allegation that he was handcuffed too tightly, but neither of these is sufficient to state a claim.

With respect to the first allegation, Higginbotham claims that he was caused to tumble to the ground and to drop his camera, damaging it, but does not allege any resulting physical injury.  True, the focus of the inquiry in an excessive force claim is on the force used by the defendant, rather than on the injury sustained by the plaintiff.  Wilkins v. Gaddy, 559 U.S. 34, 39 (2010) (per curiam) (explaining that Hudson v. McMillian, 503 U.S. 1 (1992), "aimed to shift the 'core judicial inquiry' from the extent of the injury to the nature of the force").  Nevertheless, "the extent of injury suffered by [a plaintiff] is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Hudson, 503 U.S. at 7 (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)).  "The extent of injury may also provide some indication of the amount of force applied."  Wilkins, 559 U.S. at 37.  Courts in this District have routinely dismissed excessive force claims where the plaintiff alleged that he was thrown to the ground, but did not allege any physical injuries.  See, e.g., Acosta v. City of N.Y., No. 11 Civ. 856(KBF), 2012 WL 1506954, at *10–11 (S.D.N.Y. Apr. 26, 2012) (dismissing an excessive force claim where the plaintiff alleged that he was punched in the chest and thrown to the ground face first, but did not allege any specific physical injury); Wims v. N.Y.C. Police Dep't, No. 10 Civ. 6128(PKC), 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (dismissing an excessive force claim where the plaintiff alleged that he was "thrown flat on his face unto the filthy ground" (alteration omitted)).  Nor does Higginbotham allege the extent of the damage to his camera.  In short, there is nothing in the complaint that would allow

the Court to infer that the defendants' actions in grabbing his legs were objectively unreasonable or constituted more than a de minimis use of force.

   The law in this Circuit on excessive force claims arising out of the use of handcuffs is particularly well-developed.  In evaluating these claims, a court must consider (1) whether "the handcuffs were unreasonably tight, (2) [whether] the defendants ignored the plaintiff's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (emphasis and alteration omitted) (quoting Esmont v. City of N.Y., 371 F.Supp.2d 202, 215 (E.D.N.Y.2005)).  Higginbotham does not allege that he ever complained to the defendants, or to anyone else, that his handcuffs were too tight.  Further, there is a consensus in the case law that tight handcuffing does not constitute excessive force unless it causes injuries beyond pain and bruising.  See Hollins v. City of N.Y., No. 10 Civ. 1650(LGS), 2014 WL 836950, at *9 (S.D.N.Y. Mar. 3, 2014) (granting summary judgment to the defendants where the plaintiff testified that the handcuffs caused her pain and bruising that lasted only a day); Sachs v. Cantwell, No. 10 Civ. 1663(JPO), 2012 WL 3822220, at *15 (S.D.N.Y. Sept. 4, 2012) (holding that "[t]wenty-four hour swelling of the wrists does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs"); Bratton v. N.Y. State Div. of Parole, No. 05-CV-950, 2008 WL 1766744, at *10 (N.D.N.Y. Apr. 14, 2008) (granting summary judgment to the defendants where medical records indicated that the plaintiff suffered from continuing swelling and bruising); cf. Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 596–97 (S.D.N.Y. 2013) (denying summary judgment where there was evidence that the plaintiff suffered from nerve damage); Simpson v. Saroff, 741 F.Supp. 1073, 1078 (S.D.N.Y. 1990) (denying summary judgment where the plaintiff alleged "swollen and bleeding wrists from

the tight handcuffs, as well as a faintly detectable scar on her left wrist").  Higginbotham alleges

that he was handcuffed for three hours, but courts in this District have dismissed excessive force

claims where the plaintiff was uncomfortably handcuffed for even longer periods of time.  See,

e.g., Omar v. City of N.Y., No. 13-CV-2439(RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27,

2015) (four to five hours); Bender v. City of N.Y., No. 09 CV 3286(BSJ), 2011 WL 4344203, at

*6 (S.D.N.Y. Sept. 14, 2011) (six hours).

　　　　It is unclear whether Higginbotham brings his assault claim under section 1983 or

under state law, but in either case it must be dismissed.  The section 1983 assault claim is

duplicative of the excessive force claim.  See Raymond v. Bunch, 136 F. Supp. 2d 71, 81

(N.D.N.Y. 2001) (dismissing a constitutional assault claim because it was "nothing more than a

claim of excessive force in the course of an arrest").  Graham v. City of New York, 928 F. Supp.

2d 610 (E.D.N.Y. 2013), on which Higginbotham relies, is not to the contrary, because it

discusses only a state-law assault claim.  Id. at 624–25.  Higginbotham's state-law claim, in turn,

fails because it is procedurally deficient.  "[I]n a federal court, state notice-of-claim statutes

apply to state-law claims."  Hardy v. N.Y.C. Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir.

1999) (emphasis in original) (citing Felder v. Casey, 487 U.S. 131, 151 (1988)).  New York law

requires that plaintiffs asserting a tort claim against a municipality file a notice of claim within

ninety days after the claim arises.  N.Y. Gen. Mun. Law §§ 50-e(1)(a), 50-i(1).  The requirement

also applies to claims against New York City employees.  N.Y. Gen. Mun. Law § 50-k(6).

Failure to file a notice of claim ordinarily requires dismissal of the cause of action.  Hardy, 164

F.3d at 794.  Because Higginbotham does not allege that he ever filed a notice of claim, he

cannot maintain a state-law assault claim.

IV.   <u>First Amendment Claim</u>

      Higginbotham claims that the defendants retaliated against him for filming a violent arrest, in violation of his First Amendment rights.  A plaintiff asserting a First Amendment retaliation claim must show that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury."  <u>Dorsett v. Cnty. of Nassau</u>, 732 F.3d 157, 160 (2d Cir. 2013).

      At oral argument, counsel for the defendants asserted for the first time that Higginbotham's videotaping of the arrest was not protected by the First Amendment because it was not "expressive conduct."  In supplementary briefing requested by the Court (Dkt. No. 20), the defendants rely on <u>Pluma v. City of New York</u>, No. 13 Civ. 2017(LAP), 2015 WL 1623828 (S.D.N.Y. Mar. 31, 2015), in which the court dismissed the First Amendment claim of a "citizen journalist" who was pepper-sprayed while filming police activity in Zuccotti Park.  The court stated that "[t]he only potentially expressive actions that Plaintiff took leading up to his injury . . . involved filming" the police activity, but went on to note that "neither the Supreme Court nor the Second Circuit has addressed the right to photograph and record the police."  <u>Id.</u> at *7 (internal quotation marks omitted).  The court concluded: "It consequently remains unclear whether Plaintiff's filming was protected by the First Amendment."  <u>Id.</u>  But it further held that, even assuming a First Amendment interest, the complaint had not alleged a causal connection between the plaintiff's activity and the pepper-spraying.  <u>Id.</u> at *8.

      <u>Pluma</u> appears to rely on a line of cases suggesting that recreational photography or filming for personal use is not protected by the First Amendment, because it lacks an "identifiable message sought to be communicated, [and] an identified audience to whom a

message [is] being broadcast." Montefusco v. Nassau Cnty., 39 F. Supp. 2d 231, 242 n.7 (E.D.N.Y. 1999) (suggesting, but not holding, a schoolteacher's photography of female teenagers was not protected by the First Amendment); see also Porat v. Lincoln Towers Community Ass'n, No. 04 Civ. 3199(LAP), 2005 WL 646093, at *4–5 (S.D.N.Y. Mar. 21, 2005) (holding that a photo hobbyist's recreational photography of residential buildings was not protected).  Whatever the merits of that legal proposition, it does not apply to a journalist who was filming a newsworthy protest for broadcast by a news organization.  See Porat, 2005 WL 646093, at *5 (contrasting the plaintiff's case with "the classic First Amendment example of a reporter attempting to take a photograph for publication with a specific story").  Pluma may be distinguishable on the basis that the plaintiff in that case, although he called himself a "citizen journalist," did not allege that he ever intended to disseminate his videos: the complaint merely alleged that he went to Zuccotti Park "with hopeful reflection upon the efforts of Occupy Wall Street."  Pluma, 2015 WL 1623828, at *7.  To the extent Pluma is not distinguishable, however, the Court declines to follow it.  While videotaping an event is not itself expressive activity, it is an essential step towards an expressive activity, at least when performed by a professional journalist who intends, at the time of recording, to disseminate the product of his work.  See generally Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 381–86 (2011) (arguing that "the modern process of image capture is an essential element in producing, and ultimately disseminating, photos, videos, and montages which modern First Amendment doctrine solidly recognizes as protected media of communication").

The defendants also raise the issue whether, more narrowly, a right to record police activity exists, a question that neither the Supreme Court nor the Second Circuit has

decided.  All of the circuit courts that have, however, have concluded that the First Amendment protects the right to record police officers performing their duties in a public space, subject to reasonable time, place and manner restrictions.  See See Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 608 (7th Cir. 2012) (invalidating a state eavesdropping statute as applied to the recording of police officers in the performance of their duties in traditional public fora); Glik v. Cunniffe, 655 F.3d 78, 82, 85 (1st Cir. 2011) (holding that there is "a constitutionally protected right to videotape police carrying out their duties in public" and that the right was clearly established; noting the "fundamental and virtually self-evident nature of the First Amendment's protections in this area"); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing a First Amendment right to photograph or videotape police conduct); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest"; the plaintiff was filming the activities of police officers at a protest).

The Court agrees with those cases.  If one accepts that photographing and filming receive First Amendment protection as a general matter (at least when they are "expressive"), it is difficult to see why that protection should disappear simply because their subject is public police activity.  "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."  First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978); see also Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978) (stating that "[t]here is an undoubted right to gather news 'from any source by means within the law'" (quoting Branzburg v. Hayes, 408 U.S. 665, 681–82 (1972))).  Further, "'[t]here is practically universal agreement that a major purpose of' the First Amendment 'was to protect the free discussion of

governmental affairs.'" Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct.

2806, 2828 (2011) (quoting Buckley v. Valeo, 424 U.S. 1, 14 (1976)). Relatedly, "the

dissemination of information relating to alleged governmental misconduct . . . l[ies] at the core of

the First Amendment." Gentile v. State Bar of Nev., 501 U.S. 1030, 1034–35 (1991). The

videotaping of police officers in the performance of their duties in public plainly furthers these

First Amendment goals.

On the other side of the ledger lies the government interest in preventing

interference with legitimate police activity. But that interest does not override all others: for

instance, "the First Amendment protects a significant amount of verbal criticism and challenge

directed at police officers." City of Houston v. Hill, 482 U.S. 451, 461 (1987). Videotaping

from a reasonable distance is arguably less of a hindrance to legitimate police activity than the

verbal challenges that the First Amendment unquestionably protects. In any event, the right

recognized here and by other courts does not apply when the recording would impede police

officers in the performance of their duties.

The defendants further assert that they are entitled to qualified immunity because

the right to record the police is "insufficiently defined." Qualified immunity "operates 'to ensure

that before they are subjected to suit, officers are on notice their conduct is unlawful.'" Hope v.

Pelzer, 536 U.S. 730, 739 (2002) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)). The

defense is thus available to public officials "if their actions did not violate 'clearly established

statutory or constitutional rights of which a reasonable person would have known.'" Id.

(emphasis added) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

The Court concludes, however, that the right to record police activity in public, at

least in the case of a journalist who is otherwise unconnected to the events recorded, was in fact

"clearly established" at the time of the events alleged in the complaint.  When neither the

Supreme Court nor the Second Circuit has decided an issue, a court "may nonetheless treat the

law as clearly established if decisions from . . . other circuits 'clearly foreshadow a particular

ruling on the issue.'"  Terebesi v. Torreso, 764 F.3d 217, 231 (2d Cir. 2014) (quoting Scott v.

Fischer, 616 F.3d 100, 105 (2d Cir. 2010)); see also Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084

(2011) (requiring, in the absence of controlling authority, "a robust 'consensus of cases of

persuasive authority'" (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999))).

   By November 2011, the First, Ninth and Eleventh Circuits had all concluded that

the right exists.  So had a number of district courts.  See Pomykacz v. Borough of West

Wildwood, 438 F. Supp. 2d 504, 512–13 (D.N.J. 2006) (denying summary judgment in a First

Amendment retaliation claim involving a plaintiff who was arrested for repeatedly

photographing a police officer); Robinson v. Fetterman, 378 F. Supp. 2d 534, 541 (E.D. Pa.

2005) (holding that the plaintiff's "recording the activities of Pennsylvania state troopers as they

went about their duties on a public highway" was protected by the First Amendment); Alliance

to End Repression v. City of Chicago, No. 74 C 3268, 2000 WL 562480, at *21 (N.D. Ill. May 8,

2000) (holding that "taking photographs of the police" was "First Amendment conduct");

Connell v. Town of Hudson, 733 F. Supp. 465, 471 (D.N.H. 1990) (holding that the police's

interest in securing an accident scene did not outweigh the plaintiff's right to photograph the

scene, and rejecting the defendants' qualified immunity argument); Channel 10, Inc. v.

Gunnarson, 337 F. Supp. 634, 638 (D. Minn. 1972) (recognizing the right of a newsman to film a

crime scene from any location to which the general public had access, unless he unreasonably

interfered with or endangered the police).  The Court is unaware of any decision holding that the

recording of police activity by a journalist otherwise unconnected to the events recorded is

categorically not protected (rather than holding merely that the right to record was not "clearly established").  At the time of Higginbotham's arrest, there was thus a "robust consensus of persuasive authority" in favor of the right that "clearly foreshadowed" an analogous ruling by the Second Circuit or the Supreme Court.  See Crawford v. Geiger, 996 F. Supp. 2d 603, 615–17 (N.D. Ohio 2014) (holding that the right to openly film police officers was clearly established by 2012, despite the absence of Sixth Circuit authority).

In so concluding, the Court parts ways with Mesa v. City of New York, No. 09 Civ. 10464(JPO), 2013 WL 31002 (S.D.N.Y. Jan. 3, 2013).  That case cited Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010), and Szymecki v. Houck, 353 F. App'x 852 (4th Cir. 2009), as evidence of a circuit split on the existence of the right to record, and accordingly concluded that the right was not "clearly established" for qualified immunity purposes.  Mesa, 2013 WL 31002, at *25.  In this Court's reading, however, Kelly and Szymecki did not decide whether the right existed: they merely held that, even if it did exist, it was not clearly established for the purposes of qualified immunity in those cases' factual contexts.  Kelly, 622 F.3d at 262–63; Szymecki, 353 F. App'x at 853.  They are thus not relevant to the question whether there is a consensus on the existence of a journalist's right to record events in which he is otherwise a non-participant.  In both cases, the plaintiff was affiliated with and in close proximity to the person being stopped or arrested by the police: in Kelly, the plaintiff was the passenger of the person stopped, and in Szymecki, the plaintiff was the wife of the arrestee.[2]  By contrast, Higginbotham had no relation to the arrestees he was filming, and was at a remove from the arrest.  In addition, both cases involved particularly dangerous situations: in Kelly, a traffic stop, which the Kelly court itself recognized as an "inherently dangerous situation," Kelly, 622 F.3d at 262 (citing

---

[2] The facts of Szymecki are taken from the district court's unpublished opinion.  See Opinion & Order at 2, Szymecki v. City of Norfolk, No. 08cv142 (E.D. Va. Dec. 17, 2008) (Dkt. No. 102).

Arizona v. Johnson, 555 U.S. 323, 330 (2009)), and in Szymecki, an armed arrestee who defied a police order.  Finally, in Kelly, the plaintiff was videotaping the police surreptitiously, whereas Higginbotham's filming was overt.

Certainly, the right to record police activity in a public space is not without limits, and some uncertainty may exist on its outer bounds.  For instance, it may not apply in particularly dangerous situations, if the recording interferes with the police activity, if it is surreptitious, if it is done by the subject of the police activity, or if the police activity is part of an undercover investigation.  As alleged, however, Higginbotham's conduct falls comfortably within the zone protected by the First Amendment.  The complaint alleges that he was a professional journalist present to record a public demonstration for broadcast and not a participant in the events leading up to the arrest he was filming.  There is nothing in the complaint suggesting that his filming interfered with the arrest.  Accordingly, and in light of the case law consensus described above, a reasonable police officer would have been on notice that retaliating against a non-participant, professional journalist for filming an arrest under the circumstances alleged would violate the First Amendment.

Higginbotham has also satisfied the second and third elements of a First Amendment claim.  With respect to the second element, the complaint alleges that Higginbotham was "taping . . . an arrest that resulted in a significant injury to the person being arrested" when he was ordered off the phone booth.  (Compl. ¶ 11.)  Coupled with the lack of probable cause, and drawing all reasonable inferences in favor of Higginbotham, this makes it plausible that the defendants were attempting to punish him for filming that arrest, images of which might reflect badly on the NYPD.  The inference is not defeated by the fact that the defendants arrested only Higginbotham, rather than everyone in the vicinity who had a recording device.  That second

course of action would have made the unconstitutional motivation for the arrests clear; instead, Higginbotham could plausibly have been targeted because his position on top of the phone booth presumably gave him a better vantage point, or because it provided a pretext for his arrest.

The third element is satisfied if the plaintiff shows "either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." Dorsett, 732 F.3d at 160 (clarifying that "[c]hilled speech is not the sine qua non of a First Amendment claim"). Being subjected to criminal charges is a cognizable concrete harm. See Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (in the context of a First Amendment claim, the issuance of three traffic tickets "was an injury in that it subjected [the plaintiff] to a state action requiring that she either appear in court, pay a fine, or both"); Brink v. Muscente, No. 11 Civ. 4306(ER), 2013 WL 5366371, at *8 (S.D.N.Y. Sept. 25, 2013) ("It is well-settled that the First Amendment 'prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.'" (emphasis added) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006))). Higginbotham has satisfied the third element by pleading that the defendants arrested him and charged him with disorderly conduct, and accordingly, he has adequately stated a First Amendment claim.[3]

V.    Claims against the City

A municipality may be held liable under section 1983 only if the plaintiff's injury is the result of municipal policy, custom, or practice. Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). It may not be held liable solely "by application of the doctrine of

---

[3] The defendants also argue that probable cause for the arrest defeats the First Amendment claim. See Fabrikant v. French, 691 F.3d 193, 215–16 (2d Cir. 2012) (holding that probable cause defeated a First Amendment claim premised on the plaintiff's arrest and the search of her house). Because the Court has concluded that the complaint adequately pleads lack of probable cause, that argument fails.

respondeat superior." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986).  Generally, "a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show a municipal policy." DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998).  Further, "the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (alterations omitted) (quoting Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir. 1993)).

Higginbotham's Monell claim is based on his allegation that there existed an NYPD policy or practice of "imped[ing] and arrest[ing] those individuals who were observed photographing, videotaping or otherwise recording the illegal and unconstitutional acts of the NYPD." (Compl. ¶ 39.)  He asserts that this practice arose in parallel to another City policy (which is not at issue here) of making unlawful mass arrests and using excessive force at Occupy Wall Street demonstrations, to discourage participation in the demonstrations.  (Compl. ¶ 38.)  But the complaint fails to allege facts raising the plausible inference that the practice underlying the Monell claim existed.

The Monell claim is supported by three factual, non-conclusory allegations.  First, Higginbotham alleges that at least 44 journalists were arrested, over 15 days, during Occupy Wall Street protests.  (Compl. ¶ 39.)  But he does not allege the number of journalists covering the protests over the 15-day period or that the proportion of journalists arrested was greater than the proportion of people arrested within the general protester population.  Nor does he allege that all, or even a substantial number, of the 44 arrests were unlawful.  The complaint refers vaguely to "[t]he high percentage of dismissals and declinations of prosecution" (Compl. ¶ 38), but does not link this to the alleged policy of specifically targeting journalists.  The allegation that 44

journalists were arrested is of course consistent with such a policy, but given a more likely explanation (journalists were simply arrested along with large numbers of regular protesters), it does not, standing alone, plausibly establish it.  See Ashcroft v. Iqbal, 556 U.S. at 681–82 (holding that the allegation that Arab Muslims were arrested and detained in large numbers after September 11 did not plausibly establish a discriminatory purpose, given that the September 11 attacks were perpetrated by Arab Muslims).

The Court is also unpersuaded by Higginbotham's allegation that Mayor Michael Bloomberg admitted to the existence of "limitations placed on the media to prevent coverage of the November 15, 2011 raid on Zuccotti Park." (Compl. ¶ 41.)  The alleged statement does not specify what these limitations were, and the statement is more plausibly read as referring to a policy of preventing journalists from accessing Zuccotti Park at the time of the raid (which happened at night, see Al Baker & Joseph Goldstein, Operation to Clear Zuccotti Park, Carefully Planned, Unfolded Without Warning, N.Y. Times, Nov. 16, 2011, at A31), rather than to a policy of unconstitutional arrests.

Finally, the complaint alleges that eight days after Higginbotham's arrest, in response to media outrage at the treatment of journalists during those protests, NYPD Commissioner Raymond Kelly issued a memorandum to be read to all NYPD officers, instructing them "not to unreasonably interfere with journalists' access to news events." (Compl. ¶ 42.)  Concededly, this could be read as supporting the inference that NYPD policy-makers were aware of a widespread practice of "unreasonably interfering" with journalists and did nothing about it until a public outcry forced them to.  Municipal inaction coupled with awareness of ongoing misconduct may properly be found to constitute a municipal custom.  See Okin v. Village of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009) ("A municipality

may be found to have a custom that causes a constitutional violation when 'faced with a pattern of misconduct, it does nothing, compelling the conclusion that it has acquiesced in or tacitly authorized its subordinates' unlawful actions.'") (alterations omitted) (quoting <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 192 (2d Cir. 2007)).  But the memorandum, as characterized in the complaint, does not support the inference that the practice in question consisted more narrowly in retaliating against journalists who filmed questionable police behavior, as Higginbotham claims.  Rather, the memorandum, like Mayor Bloomberg's statement, seems concerned with journalists' <u>access</u> to protests.  <u>Cf.</u> Rule 407, Fed. R. Evid. ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . culpable conduct.").

Higginbotham has thus not adequately pleaded the existence of a municipal policy, custom, or practice, and accordingly his <u>Monell</u> claim must be dismissed.


CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part as follows: the claims for malicious prosecution, excessive force, and assault are dismissed, as is the <u>Monell</u> claim; the motion is denied with respect to the false arrest claim and the First Amendment retaliation claim.

Higginbotham may move for leave to file an amended complaint within 30 days of the date of this Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 12, 2015